Good morning, your honors, and may it please the court and counsel, when we look at this These are property tax consultants. Are they fiduciaries? Did they manage customers? Could they bind both O'Connor and the clients? And were customers substantially affected financially on how they did their job? The answer to all those questions is yes. And when we look at the issues that we've raised here, the lower court clearly read out several portions of the regulations and read in things into the regulations that did not apply. The court found below that when we look at the three tiers, we look at whether these people were paid on a salary basis, whether they engaged and were tax and financial consultants, and whether they exercised discretion in matters of significance. Below, the question about whether 201C applied was our primary issue. So when we look at this case, we have to look at that regulation. That regulation was not cited by the court below in its decision. So what we're asking today is that the court properly interpret these regulations and that it apply the facts that are already in the trial record and that the court reverse and render in the appellant's favor. In what way did they consult or offer advice to O'Connor's clients? Consult? Well, Your Honor, that is the key. Consult and advising are two different things in the regulation because that's a disjunctive. Consult or offer advice is the… or a business before the property tax authorities for compensation in either informal or formal boards. So they don't have to advise the clients, but they represent them and they consult. How do they consult? Well, they consult because a consultant can act on behalf of someone else and in their capacity, just like a lawyer does. How are they consulting? What facts are in the record that they are actually engaged in consulting? Well, they have to analyze each file that they get and they have to choose the right evidence to present to the taxing authority and then they have to negotiate the values. Are they actually doing that, picking any evidence or negotiating? Yes, Your Honor. I thought that they had a… that they aren't exercising independent discretion or judgment because they have to use the already prepared files and the training manual which says exactly what to do, step by step. Well, Your Honor, that's not exactly right. There's no script. There's a stack of paper about two feet high that they're all given to make their job a little bit easier because historically, if you go back before 2009, they had to gather all this information themselves. But O'Connor, to make the job easier, started creating these files that had most of the information in it that would be relevant and organized it in a particular fashion and trained them on it. But that didn't eliminate the discretion. They had to actually choose the evidence that was appropriate to argue either from a market standpoint or from an equity standpoint or from other factors that the valuation of the property wasn't correct. Did they have any discretion in the values they proffered at the hearings or did they have to follow the amounts listed in the files? No, Your Honor. They had plenty of discretion. The only thing they couldn't do was agree to a value that the Harris County Appraisal District offered. They could agree to any other number? That was low because if they agreed to a higher number or the number that the Harris County Appraisal District offered, they would forego appeal. But they had jurisdiction to pick any number. They didn't have to just pick a certain number on the file. Oh, yes. Absolutely, Your Honor. The primary evidence that we had below about this issue were the documents, the hearing files, and where it showed that they had to analyze and negotiate. And they often signed these files. In informal hearings, they could sign a file, as long as it was lower, to result in tax savings to the client. And they often did that. The vast majority of them were resolved at the informal hearing stage. If they couldn't reach an agreement and they couldn't agree to a lower value at that stage, they would go to the formal hearing stage and then they would advocate on behalf for a lower value. At that stage, also, they couldn't agree to the H guide value unless they got permission to do it. That was because it would waive their appeal, their client's appeal. And so when we look at the hearing guidelines, and the hearing guidelines in paragraph 28 were the focus of what the court said eliminated discretion. But I would invite the court to look at that. It's at ROA 5856 and 5858, and it's just a page. But the types of things on it are important because they are coextensive with the fiduciary duties that each of these property tax consultants has. They have that they have to timely report hearing results, that they can't make agreements in formal hearings or they'll waive their appeal. They can't do unauthorized hearings. They can't not show up, and they can't do an informal sign-off without written approval. An informal sign-off is something where all of those things would breach their fiduciary duties and it would also waive their client's appeal. That is a problem in every instance. So those hearing guidelines is what, in paragraph 28 of the court's decision, the court used to say that they had no discretion. They didn't have to stick with the first page of that stack of paper. The hearing guidelines or the hearing evidence that was produced and that Mr. Kelly assisted in compiling demonstrated that these people often and repeatedly started with that value and then negotiated to a reasonable value that they could agree on that was less than the appraisal district's value. Now, when we're looking at what the court did below and why this is important, we have to look at the regulation itself. 541.201C is the regulation. And I'm going to read for a moment. The regulation has a lot of things in it, but I want to read for the court how the court read it below. The court didn't cite to it, but to get to where the court decided, this is how the court would have had to have read this regulation. An employee may qualify, and this is at page 49 of our appellate brief, an employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management, to the general business operations of the employer's customers. Thus, for example, employees acting as advisors to the employer's clients may be exempt. Now, that's how the court read it below. When you look at all the ways and all the arguments that were made, when you look at paragraph 11, 6, 7, and 14 of the findings of fact and law, we see all these elements that are in there. We see that they didn't attend property tax hearings on behalf of businesses. We see that the employer's work must be directly related to the assistance with running the company as opposed to doing the work related to the production of the business's services. We see that a citation to administrative interpretation 2010-1, which it calls persuasive authority, and we see the reliance on the only two witnesses that the court relied on primarily, which was Mr. Kelly and Mr. Webb, which says that the contents of the administrative interpretation 1 show that plaintiff's duties were production in nature. Now, why is that wrong? That is wrong because it ignores the rest of the regulation. It ignores all of the rest of it. This court has never addressed this question, so it is an issue of first impression. But it did address it in dicta in Xanakos, and it talked about 541.201C, and this is what the court said in that case. It said you have to read these parts, and I'm going to read the parts that the court ignored. An employee may qualify for the administrative exemption if the employee's primary duty is directly related to the management of the employer's customers. Thus, for example, employees acting as consultants to the employer's clients or customers, as tax experts or financial consultants, for example, may be exempt. The court cited none of that, addressed none of that, and read out all of that. Do you concede that they did not satisfy it related to the business operations of the employer itself? O'Connor's own testimony is that they're not helping run the business. Mr. Webb did say something like that, but the Hamby case is instructive on this point because that's a legal question itself. Right, but there's no evidence in the record that they're helping run O'Connor and Associates or whatever. Well, to the extent that we look at Hine and Hamby and those types of cases, what those cases say with respect to 201B, Your Honor, is that in the tax and financial consultant context, that is a carve-out in the regulations where what those people are doing is exactly what their employer is doing. And so that does not take it out of the realm of the regulation because of that, and in fact this court in Zanico said exactly that. Okay, but you're really relying on the employer's customers. Yes. Yes, Your Honor. Our primary case and our primary thing is 201C. Yeah, or the employer's customers. That's the part you're relying on. Right. Management of the employer's customers. That is what was read out by the court and not addressed. Also, the court read in to that several things. It read in, with respect to the primary duty, the management of business customers using AI210-1. It also read in the words purely personal to describe all that. And it also read in or accepted the idea that you could only fit in within this context if you were an advisor and not a consultant. So Texas law defines what a consultant is, and we know that these people are consultants under the law. So they could have chosen a different word or they could have said just advisor, but the regulatory, but DOL did not. The Department of Labor said or, and used the disjunctive with respect to all of these. It did not add purely personal, and in fact, in the preamble to the 2004 regulations when it had an opportunity to do so, it rejected adding those words to the regulation. Now, when we look at discretion and independent judgment, Your Honor, I think this was the area where the court basically said that O'Connor was acting in good faith and denied liquidated damages in paragraph 28 of the decision. That is interestingly close to the new standard, which was applied in Encino and Faludi by this court, which is the fair reading standard. I don't think they're the same standards because I can imagine circumstances where good faith would exist but a fair reading would not. Like, say, for example, if O'Connor was relying or an employer was relying on advice of counsel or advice by their HR director and that was reasonable or in good faith, it might not be a fair reading either. But in this case, it's both. When we look at the regulation, we see that Mr. Webb and Mr. Kelly both interpreted these regulations the same way and what they were doing the same way. They both thought they were exempt. Mr. Webb, the HR director for O'Connor, thought that they were exempt. Ms. Felix, the general counsel of O'Connor, thought that they were exempt. And in looking at it, they squarely fit into these things. When we look at discretion and independent judgment, we have to look at what their actual duties were. The PTCs have the authority to bind both OCA O'Connor and the residential customer property owners before the various appraisal districts. Each property tax consultant had a fiduciary duty to the residential customer and they had to work within a framework that allowed O'Connor to meet its fiduciary obligations the same. That was the guidelines. Mr. Kelly, who started out as a property tax consultant during this time frame and then became a manager and is now a senior manager at O'Connor, emphasized that property tax consultants worked on behalf of O'Connor and customers in a complex legal and financial framework where property tax consultants are experts in tax or financial consulting. That's an important statement. What do you think about the use of management section of the CFR that specifically says you can't get the 13A1 exemptions if the employees apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances? Why isn't that really what's happening here? Well, Your Honor, because I think it reads out 541.704, and the court below didn't address that at all. That is 541.704. 541.704, and that's a perfect timing, Your Honor, because it follows on the heels of Mr. Kelly's statement. It says, the use of manuals, guidelines, or other established procedures containing or relating to highly technical, scientific, legal, financial, or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude the exemption. That's not true about these manuals. I could pick up this manual, and I would know what I have to go argue because I would know I can't do that amount, but I could do below, and it would have exactly the square foot. It would have all what the last appraisal for the past several years. The manual has all the information, and I'm not using any independent tax or accounting expertise in going to the hearing, am I? Well, yes, Your Honor, because you have to select the evidence from the file. I don't have tax or accounting expertise. Well, Your Honor, but you are a lawyer, and lawyers are allowed to be property tax consultants as well. We're all trained in a certain way, and Mr. Kelly testified in his testimony that you had to be trained in a certain way to do this kind of work. It's not just rote, and it's not simple. It is something that they have to apply. They have to use their own judgment. They have to work within it, but they have to use their own judgment. They're not calculating any numbers or anything, are they? Well, yes, they are, because they're looking at it to see whether the market valuation is proper. They're looking at it to see what might impact the equity of the House. There was an example that Ms. Singletary gave during her testimony about, like, a house that had comparables, and it looked... Just look at the comp and see if it's the same or lower or higher. No, that's not the only thing you look at, Your Honor. You look at whether the house was renovated recently, whether it had some kind of, as Ms. Singletary testified, whether it had a stalker recently that all the neighborhood knew about, whether it had, you know, or something dear, dear to my heart, whether it was flooded recently. You know, so I think I'm out of time for right now, Your Honor. I'll save it for rebuttal. Okay. I would appreciate if you could address the independents more on rebuttal, please. Yes, Your Honor, I will do. May it please the Court. Counsel, my name is David Mensis. I represent the class of overtime plaintiffs, and we ask this Court to affirm the trial court's judgment in all respects. The defendants bore the burden of proof at trial. The Court considered eight years' worth of evidence, 20 depositions, and what is now a 50,000-page record, considered all of it and found that the defendant failed to prove their affirmative defense. And the truth is the evidence not only supports that finding plausibly, it weighs heavily in favor of the trial court's finding as to all three elements. When we opened in the trial, we told the Court that the case was unusual, and it was. And it was unusual in part because such an overwhelming amount of unusually clear evidence came straight from the mouths of their corporate representatives. And so we knew as far back as 2012 when those depositions were taken that by virtue of their testimony that they had already given, they wouldn't be able to meet the elements of the exemption. There were two corporate representatives. We'll be talking about them a little bit more, Phillips and Webb. Their testimony was such a house of horrors that by the time we got to trial, they weren't even on the witness list for the defendants. And they put a new corporate rep up at trial who said even worse things that proved liability. I think you pointed out in already opposite to brief, just a little background on the case, it seems like a lot of your plaintiffs fell by the wayside as this process was going along. What was the reason for that? Your Honor, between the time we sought the conditional certification and Judge Harmon, the original judge, ruled, it was about 13 months. And so we lost some of them because of limitations. And then we had a few motions that were pending. One was because of limitations. Limitations, okay. The Court ruled ultimately that we didn't get there on willfulness, so we had a two-year limitations period. Then after that gap, there was a period where there were two motions pending. One was a motion for leave, okay, where we wanted to add an alter ego. And another was a summary judgment. Those remained pending for three years, I think. And so finally what happened was the parties consented to try the case before Magistrate Judge Stacy. Well, by that time, not only had we lost some because of limitations, but we'd also lost some because we flat couldn't find them. Their address had changed or a couple died, and so that left us. And then we had, I believe, Your Honor, six that settled out. And so by the time we got to trial in 2018, we had 11 left. Does that answer your question? Thoroughly. Thank you. Sure, Your Honor. I think it's important just let's understand what a day in the life of these folks is. They get hired. They're seasonal workers. The average lifespan of the job is three or four months. They get there. Sometimes they get two weeks of training or a week, and sometimes they get a day or two. For example, if they're a lawyer or a real estate agent, as their corporate rep at trial said, Mr. Kelly, they might just get a day or two. And why is that? It's because the whole entire process is automated, that's Patrick O'Connor's word, and systematized. Here's what happens. Each night they get a stack that counsel described at trial of files, four feet high, separated by blue pieces of paper, 65 of them. They are required to prep them. That's an O'Connor word, prep. And what that means is go home and review all 65. And if you do the math on that, and I covered this with Mr. O'Connor, you have three to five minutes per file if you want to sleep. And it's a very quick dive to get rid of extraneous stuff. For example, I live in Houston. You can't be comparing a house in Humboldt to a house in Galveston, but that sometimes happens. Why did that happen? Because the people preparing the files are in India. They don't have necessarily the frame of reference that these individuals that I represent might have had if they were preparing the files. But this enables my clients to then grab the file and use what Mr. O'Connor describes as automated evidence packages that do the calculations for them during these hearings. We talked a lot about discretion and judgment. We don't get there for reasons I'm going to explain in a minute, but I'd like to also circle back to why the job has nothing to do with the first element of the duties test, which is management or general business operations. That has always been a hallmark of this exemption, dating back 70 years, and it still is today. The primary duty has to relate to running or servicing the business. And a distinction has been drawn for decades by our courts, including cases we cite, seminal cases, that says there's a dichotomy that isn't always dispositive and sometimes just a tool that analyzes are these folks helping run or service a business? It can be their employer's business or it can be a customer's business. Are they doing that or are they making widgets? Are they producing the product or, in this case, the service the employer exists to market? Their primary service offering, if that's what the employees are producing, is particularly far afield from what the exemption requires. So here what you've got are customers that don't have business operations. They're homeowners. They're not running businesses. And then you've got these property tax consultants that are hired by O'Connor, given up to two weeks of training, fed these files that they must use. There's no business operation that a customer could have. None. It's 100% that's stipulated. There's not somebody running a home business or something. It's stipulated. It's a different category. Well, stipulated is the wrong word because it doesn't have preclusive effect. But we saw that this might come up. And so when I deposed Patrick O'Connor in 2014, I asked him to clarify. I wanted to be clear. Our clients only represented homeowners at these tax hearings. They didn't handle business owners. Absolutely, it's not because commercial property tax consultants represent the business owners, which is why they're not part of our case. They do that too. So that's why they have all these state courts. That's right. That's right. That's right. The business side also comes to the court. So if you are running a business out of one of these homes, you go on the business side of the business. You do. Not one of these seasonal home persons. I can't tell you if they're seasonal or not, but I can tell you there's a very distinct separation within the company, O'Connor and Associates. You've got the commercial folks and the residential folks. If I was running a law practice out of my house, which guy or gal would I go to? You would go to the commercial side because those properties are called income properties. Okay? So if they're generating- Even though I'm also living there, the fact that I'm running a law practice out of there would move me over. Correct. So we're only dealing with the residential side then? Only homeowners. Only homeowners. Only homeowners. Patrick O'Connor said the commercial folks handle income properties. None of our folks were commercial agents, and it wasn't a meaningful part of what they do. And he went on and on about how that kind of work is far more complicated than this, where they can be fed a file, given an automated evidence package, and go handle the hearing. He said they don't even have time to deeply analyze the file. And if they didn't use that first number during the hearing, they had to ask for it, to use their phraseology. They could be fired. And so what happens is- And I think this is very important to understand the mechanics of what they did. There's two kinds of these hearings. They're not in court. You go to the appraisal review board. I'm sure you all have done this. And you go and you wait for them to call your number. And then there's two phases. There's an informal hearing, which happens in a cubicle. You go and you sit down and you say, Hi, I'm protesting the house on Laurel Street. And then they say, What's your opinion of value? They being the appraiser. What's your opinion of value? And guess what? That opinion that I must give if I'm the property tax consultant, it's prescribed. It's in a cover sheet in the file. I must use it even if I think it's crazy. And if I don't, I might get fired, and their guidelines say this. So, for example, you'll see, and we put a cover sheet in our brief, you'll see property value at $40,000, and you'll see that the property tax consultant had to give an opinion of 20. And they knew it was crazy, and they didn't want to do it, but they're not allowed to ever agree that a value shouldn't be reduced. So it's not true that they're at all times free to say another number? They have some freedom, but it's within narrow parameters. For example, Judge Elrod, if I say, Well, this house, my opinion of value, which comes from this sheet, is $20,000. And you say, Well, that's way too low, maybe 30. There is some room to haggle, but it's within very narrow constraints. Doesn't that happen in that little room, the cubicle? It does. No, that's in the cubicle. And then if that doesn't work, and by the way, it's important that they can't agree not to reduce value. And you might think, Well, heck, if I hire somebody, I don't want them to agree not to reduce value either. But sometimes that's important for reasons I'll explain in a minute, at the second phase. So the second phase is, Well, we couldn't work it out. Now we've got to go to the appraisal review board and argue in front of this panel of three who are really just homeowners. They don't work for the HCAD, and they're going to decide my fate. And that's a different format. It's more of an argument format. So the property tax consultant argues, and then the appraisal district representative argues, and then the three folks on the ARB panel decide value. Now sometimes the appraisal district will want to agree on a number. Hey, why don't we agree on $50,000? Guess what? Then the property tax consultant has to read specific verbiage saying, I do not have the authority to agree on a value. O'Connor requires it. Now they'll tell you, Well, that has to do with this fiduciary duty. We've got to protect our client's rights. That's fine. It might. And yet that has nothing to do with the FLSA or the overtime claim. They are, again, operating with very narrow parameters. And so you heard some of our clients testify at trial. The fact that I couldn't reach an agreement, it would infuriate these ARBs because I was in front of them all day, eight hours a day. It's one thing that the employer prevents them from agreeing, from doing certain things. What your friend on the other side was referring to is whether you'd have the right to appeal if you agreed. It seems to me you can take some things off the table but still leave a lot of discretion on other things. I don't think the be-all, end-all is they couldn't make certain agreements so long as they were providing some other services that fit within the regulation. Would you agree with that? Or do you think that's somehow significant that this ultimate decision perhaps they could not reach sometimes? I do think the regulations in the case law require more, Your Honor. First of all, they have to exercise the kind of discretion and judgment that's required on a customary and regular basis. And so what the courts do, what the case law often does, is it distinguishes. When is something the use of skill and when is it the exercise of discretion? In this instance, if you're given a file with the values and you're told you start with this and then you use everything in here, you can't come up with your own file, and then try to get them to the lowest number possible, the case law says that when you're operating within those narrow confines and you're using skill, that use of skill is distinct from the use of discretion and judgment, and that's why a trial, and it's in our brief repeatedly, we talk over and over with our corporate representatives about they had to use this skill, they had to use this skill. They were taught standardized techniques in training, established techniques that Appellant's brief calls proprietary in nature. That's why this works. That's why you can get people off the street who have never done it, employ them for three or four months with very little training, and have them be able to go do 65 of these a day because you are telling them these are your boundaries, do it our way, and guess what? If you don't, we might fire you or we might just dock your pay. And that's why you see, and so when you, the case law says those kinds of rules are intended to create conformity, and that's what they did here. I would like, if I could, Your Honor, if I've answered your question, I'd like to circle back to that first. Let me add one more thing, too. I'm not going to keep you from circling back, but how does it fit into the regulation, the argument you had made in your brief, that there really, you can certainly correct me if I'm wrong, but there's no real interaction between the customers involved, the homeowners, and these employees who are your clients. There's, I don't know if they even have time to say hello. Are the clients there at these hearings? They can be, but like, for example, Monique Fraser, the lead plaintiff. There's no interaction between your client, between the people you're representing and the homeowners. Correct, Your Honor. Monique Fraser was our lead plaintiff. She was one of the few that actually survived season after season. She said she went to more than 10,000 of these hearings, and she estimated she maybe met four homeowners. It's simply not a part of the job. How does that fit into the regulation? It does, Your Honor, squarely, because if you see what happens dating back to 1990, there was a case called Bratt, and Bratt is cited by this court in the Dewan opinion 27 years later because these principles in here today. What it says is the concept of advice and consultancy. It's not a colloquial term. It has to do with advising a business on how the business should be run or run more efficiently. That's what the law says. That goes way, way back. In other words, if I'm advising and consulting as contemplated by this regulation, which has to do with running or serving a business,  I'm either advising or consulting. To that point, the Zanacos case they cite really illustrates why their position is not a sound one because they relied so heavily on it, and they accused the court of ignoring Zanacos, but the court didn't. The court just rejected their arguments. In Zanacos, you had employees of one company going out and helping manage the business of another one, providing supervisory oversight to people running a business. That is a very different context than we have here, which is why I'm now going to circle back to that first part of the duties test. Running or servicing a business. A business. That's the buzz phrase. Well, in 2004, the Department of Labor and its regulations and the accompanying guidance gave some insight into what that means because it contemplated sometimes people will be doing work for an individual customer, a customer who's a person. When is that work deemed to be the kind envisioned by this exemption? And the answer is it's okay that they're an individual so long as they're running a business, but people whose business, in quotes, and this is what the DOL says, and this is in our brief, is purely personal. This is in the guidance. It's not made up. It came straight from the department. They don't have business operations such that this exemption would cover it. So that's 2004 with the regulations. Fast forward six years when the Department of Labor is assessing whether mortgage loan officers are exempt. And they say, well, we're getting loans for homeowners. Historically, they had been exempt, and so this was a reversal, of course, by the DOL. But they're seeking home loans for their homes. Is that management or general business operations? Do they have businesses? The DOL said no. That's what purely personal means, and they refer back to the 2004 regulations and say, look, there's a distinction here, and they give examples. For example, if someone's out trying to buy a warehouse, and they're getting a loan for that, that might be business. Or if they're seeking help to run a business, that's not purely personal. But if they're seeking a loan for their home, it is. That's what we've got here. We've got homeowners. Admittedly, it's important to them. They want their property taxes down just like you do, just like I do. That's not business. That's not running or administering a business. So I don't think we even get to the next part of the test, which is discretion and independent judgment. Do you have to get into, is it enough discretion that you can lower it $500 and still? I think the case law combined with the DOL guidance provides those answers. Now, the appellants would have you ignore all of the guidance, all of it. They've accused the Department of Labor of making up new law. That same argument got rejected by the Supreme Court in a case called Perez, where someone was challenging this administrator's interpretation as something that should not be given the effect of law because there was no notice and comment, period. And that argument ultimately went all the way up and was rejected. The reason that that administrator's interpretation that we cite is so important here, it's different from an opinion letter. They're only put out a couple of years, 7 in the last 10 years. Do we need it? Probably not. You know, we spend a lot of time in whether there was notice and comment. Right. This is something we do every day. Right. I don't know that we do. Excuse the text of the CFR and it doesn't fit in number 2 and then we're done. I think we can, and the reason we can, Your Honor, I don't think we have to, and I certainly don't think that the guidance can be so summarily tossed out as they would urge, but the reason we can is if we go back to Dalheim in 1990, we look at Bratt in 1990, we look at Bothell expressly adopted in 2002. Bothell says if your duty is squarely on the production side, you're producing the product or service your employer markets. You're not exempt. It says this dichotomy, it's usually just part of the puzzle, but when your duty falls squarely on the production side, it is determinative. That has, in 2004, the DOL adopted that standard in Bothell. Now, these cases, Dalheim, Bothell, these are cases that several of them come up in the findings of fact and conclusions of law. Dalheim is probably the seminal case on this whole issue of the dichotomy, and yet it's never cited. It's never discussed by the appellants. Just as Dewin, 27 years later, is never discussed. And we knew from their corporate representative's testimony at trial that he might go so far as to admit that our client's duties were squarely on the production side, and that's exactly what happened. I asked him . . . Let me ask you about the battling 28J letters and the Encino case. You responded saying that there was an uncontested issue of law in the district court and talking about narrow construction and whatever else of regulations. It does seem to me that we need to apply the law that it exists, as we understand it, to exist. I'm not sure a stipulation of what the law is. If we don't think that the law is binding, we can certainly discuss that among ourselves. Judge Elrod has said we may not get into this at all, but if we do, it does seem to me that whether this is a fair reading, this administrative interpretation . . . Is that what the A stands for? The AI. If it's a fair reading, it would be hard for us to ignore a determination, if we're going to use it, of whether it's a fair reading of what they had to examine, both the regulation and the statute. I'm not saying you have to agree with that, but do you think the stipulation overrides all of that? I do, based on recent case law that addresses invited error, and I think that's rooted in fairness to the judge, but also efficiency. If the parties propose that a proposition of law is uncontested and then they go to trial and don't raise anything different, and then they file a post-trial brief and a response brief and an appellate brief and never raise the issue and then try to raise it in a supplemental authority or apply, as has occurred here, I don't think that's enough. But let's just say the fair reading standard had been in play the whole time . . . You've answered my question and you're out of time. But I think we get there even with a fair reading, Your Honor. Thank you. Do you have your argument? Counsel, I know I asked you to address discretion, but I don't want you to spend your time on that unless one of my colleagues wants you to spend your time on that anymore. I'll probably address some of that, Your Honor, but I want to hit a few points first. The number is much more important. Sorry? The second phrase of the CFR is much more important than we talk about managerial. Oh, you mean the production administrative dichotomy thing? Okay, Your Honor. Well, I mean, first of all, I don't think that that applies at all in the context of tax and financial consultants. Dewan, Dahlheim, Zanikos, all of the cases that talk about it don't address tax and financial consultants, and even Judge Lake in Moorock v. Spangler actually noticed or talked about how the tax and financial consultants were a carve-out in that. Well, you know, here's the problem. I don't know that the same label of someone is controlling a federal statute. If they called them property tax doctors, then a doctor exemption wouldn't automatically apply simply because they used that word. Well, Your Honor, I— The word consultant, it's kind of hard for me to see how these folks are consulting when they don't even talk to the client. Well, Your Honor, I've—I mean, I worked in D.C. a long time, and I met a lot of consultants that never met the clients that they were pining upon. You know, they would study things, and they would work in the context of government contracts like MITRE, you know, Booz Allen, Hamilton, all those guys. None of those guys met their clients or met the people that we're talking about. I talked to a lot of my clients on the phone and didn't meet them personally. I'm not talking about that. But it wasn't that I never had any contact or communication with a client. I still considered that consulting. Well, if you're going to advise somebody, I would agree. But that's why the disjunctive is used in the regulation, advisers or consultants, because it denotes that there are two different types, one that might deal directly with the clients and advise them and another that might deal—advocate for the clients without— You know, I mean, and it's a misnomer to say that they don't—oh, I'm sorry. Well, in this instance, it means analyze, negotiate, or advocate. Where does that definition—where can I find that definition? That's in the Texas Code, Your Honor. We cite it in our brief. It talks about what a property tax consultant is. Where does that definition of the other one say? Reference to consultant. Well, I don't— Somebody who never intersects with the client. I don't think that's ever been addressed, Your Honor. You know, I mean, I would say this. There are several cases and several DOL opinions that talk about representing people on a purely personal level. Those are Hogan, Flossa, 2006-43, Hine, and Henry Morgan Stanley cited in our brief are all examples where the consultant was doing the same thing as the company and they were advising people on their portfolios or purely personal things rather than business things. And so in those kinds of contexts, I mean, I don't think any of us would dispute that a financial consultant or a financial advisor at Morgan Stanley is exempt, but that's exactly where we're headed because what the natural result of what the plaintiffs or what the appellees are arguing here is that you have to meet another exemption to meet this one. You have to be professionally exempt or you have to be a highly compensated employee, and that's what they argued below, that this regulation can't operate on its own. But Zanico says exactly the opposite of that. And so when we look at the idea that anyone off the street can do this, first off, when they're being hired, when O'Connor was hiring these people, they required that they have two years' experience in real estate. They have to have a license of some kind or get a property tax license. They have to have 40 hours of training under the law. And they also have to analyze complex files. They have to pick the evidence that they're going to use, negotiate property tax values based on that, and then if they're failing that at the informal board, they have to advocate on behalf of the client. Now, the best evidence of that is in our brief at page 39 when we're looking at and this is the same evidence that the court below ignored. When you look at the informal and formal hearing files and the supporting documentation along with the summaries of same, it absolutely refutes unequivocally that the CAD value was the only value they were allowed to say. When you look at that, the value on the cover page, which didn't always exist, when you look through those files, you'll see that it didn't exist initially, it existed for a couple of years, and then it went away completely because they weren't following it anyway. They were analyzing the file and picking it out. There's voluminous documentation on this and there's arguments that you can hear. Those pages are all listed at page 39 of the brief, but the summaries that summarize those also talk about this and they say that they show that these people did not rest on the OCA report value. They went in there and they vigorously advocated on behalf of their clients and they met their fiduciary duties on a daily basis. Do you agree, though, that there is no business operation of the customer? These are not business clients. All the hypotheticals with the home businesses and Judge Haynes working at a law office, you agree that none of those would be in this category? Well, I don't know that that's the case, Your Honor. I mean, there wasn't anything established below that there wasn't a home office involved in these people. In Houston, where I live, you don't have zoning restrictions, so everybody could have—I mean, I have a home office of my own. Conard and Associates has a whole different division to deal with those income clients, right? Well, with the income-producing clients, yes. And so you would be income-producing if you had a law office, hopefully. Well, yes, Your Honor, but I don't think that the production-administrative dichotomy applies in this instance because the preamble to the regulation specifically rejected it. And when you look at this, I trust that you'll give a fair reading to the regulation and you'll rule in our favor, Your Honors. Thank you very much for your time. Thank you very much. We're going to take a brief recess before considering the final case for today. This case is submitted. We appreciate the arguments. Thank you.